UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LEATRICE HAMILTON and
MILDRED P. SMITH,

                  Petitioners,                  04 Civ. 9605 (PKC)

    -against-

                                                                                    MEMORANDUM
                                                                                   AND ORDER

DEPARTMENT OF LABOR,

                  Respondent.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Petitioners Leatrice Hamilton and Mildred P. Smith bring this action against respondent United States Department of Labor ("DOL"), their former employer, seeking review of a final decision of the Merit Systems Protection Board ("MSPB" or the "Board"), affirming their removal from federal service for refusing to accept a geographical reassignment from Albany, New York, to Hartford, Connecticut. For the reasons outlined below, the petition for review is granted and the matter is remanded to the MSPB to determine an adequate remedy.

<h2 style="text-align:center">I.<br>Background</h2>

        Prior to their removal, petitioners were employed by the DOL's Office of Federal Contract Compliance Programs ("OFCCP") in Albany, New York as Equal Opportunity Specialists. The OFCCP is a part of the DOL that monitors and enforces compliance with anti-discrimination laws and affirmative action policies on the part of private companies that contract with the federal government. Hamilton had worked in

the Albany OFCCP office for twelve years and Smith for thirteen years. The terms of petitioners' employment were governed by a national collective bargaining agreement (and agreements supplemental thereto) between their union, the National Council of Field Labor Locals ("NCFLL" or the "Union"), and the DOL. (A1070-1269.)

In September 1993, President Clinton directed all federal agencies to develop plans to streamline services provided to the public. (A87, 258.) In 1994, the OFCCP responded by formulating a plan to reduce its number of supervisors by 50 percent and make a larger portion of its staff front-line employees who interface directly with the public. (A258.) In addition, the total number of OFCCP employees would be reduced by 12 percent by fiscal year 1999. (Id.) The plan called for the merger of certain OFCCP regional offices including OFCCP "Region I" (New York) and "Region II" (Boston) which would result in the closure of, among other locations, the Albany District Office. (A61, 80.) No dates for office closures were set because of an "attrition-only" policy promulgated by the OFCCP, directing that no employees would be forced to transfer or retire and the selected offices would close only after all employees had left voluntarily. (A1732, 1749-50, 1787, 1792, 1841-42, 1844-46, 1918-79, 2033-34, 2043.) The OFCCP plan stated that "[i]f employees remain after a supervisor has attritted from the designated office, the office would remain in existence as a field station until all employees have attritted." (A259.)

Subsequent to 1994, the planned closure of the Albany office was noted in several OFCCP documents. For example, a 1996 streamlining plan submitted by OFCCP Northeast Region Director James R. Turner, Jr., proposed merging the Boston and New York regional offices which would result in closure of the Albany office and

reassignment of its employees to the Hartford office. (A251-55.) The proposal argued that the merger would increase efficiency and reduce both staff and administrative costs. (A25.) Two additional merger plans were prepared by Turner in 1996, each of them also calling for the closure of the Albany office and each claiming that such action would, inter alia, result in staff reductions and administrative cost savings. (A435-39, 441-51.)

In the spring of 1998, the OFCCP and the Union began negotiating the merger of OFCCP Regions I and II. An impasse was declared because, among other reasons, the OFCCP would not agree to refrain from forcing the transfers of employees beyond 1999. (A473.)

Petitioners were aware of the desire within OFCCP to close the Albany office and expressed concern about such a plan as early as November 10, 1998 in a letter to the DOL. (A616-20.) DOL Deputy Assistant Secretary Shirley J. Wilder responded to petitioners in writing by stating that they would be given an opportunity to comment upon any plans to close the Albany office. (A621-22.) At some point in either 1998 or 1999, petitioners found themselves to be the only remaining employees in the Albany office, their former colleagues having all retired, quit or voluntarily transferred to other locations. (A244, 343.) From that time until they were removed from federal service, petitioners were required to do much of their own clerical work. (A167.) In addition, they were required to travel to Hartford for frequent staff meetings, and were supervised remotely by the Hartford office. (Id.)

In or around August 2000, the DOL decided to pursue a plan to move the Albany office from leased space within a privately-owned building to a federally-owned building within Albany. (A480-81.) It was noted by Northeast Region Director James R.

Turner, Jr. that the OFCCP "would need space for only two (2) Compliance Officers, unless they decide to move to Hartford, CT, as a result of the merger discussions." (Id.) Correspondence regarding moving petitioners, to the "Federal Building" in Albany continued up until the fall of 2001. (A68, 1051-68, 549-612, 1950-55, 2028-32, 1809-12, 1899-2000.)

In January 2001, petitioners' Union and the DOL restarted negotiations regarding the merger of OFCCP's regional offices. (A1802-03.) According to a February 2, 2001 e-mail from Union negotiator Frederick DeWald to petitioners and others, the negotiations "concluded at approximately 11 pm" on February 1, 2001 (A749) and resulted in a written agreement entitled "Memorandum of Understanding Between The U.S. Department of Labor (DOL) and the National Council of Field Labor Locals (NCFLL) AFGE, AFL-CIO" (hereinafter the "MOU").[1] The MOU constituted an agreement between "the DOL . . . and the NCFLL [that] was developed and accepted by both parties in accordance with the provision of the Master Agreement." (A71 (MOU § I.).) Under the heading "Subject," the MOU stated that "[t]he terms and conditions of the MOU are directly caused by the merger of OFCCP Regions IX and X [the San Francisco Region and the Seattle Region] and Regions I and II [the New York Region and the Boston Region]." (A72 (MOU at § II).) Under the heading, "Terms of the Agreement," the MOU provided in relevant part:

> The Albany District Office will be redesignated as a Hartford District Office Field Station located in Albany. The two employees currently assigned to the Albany District Office will be assigned to the Field Station. The two employees will not involuntarily lose pay or grade or be transferred as a result of this merger action.

---

[1] The February 2 e-mail noted, "one of the key provisions is protections for our incumbent bargaining unit members . . . and creation of an Albany, NY Field Station, in the Hartford District Office. (A. 749.) Of course, this is nothing more than the unilateral statement of belief of one party to an agreement.

(A72 (MOU § III(F).) The MOU further stated that it would become effective on February 2, 2001 and that "[i]t is understood that nothing in this MOU implies a waiver by Management of its rights." (A73 (MOU § IV(C).) The agreement provided that it was to be distributed to all affected employees and because petitioners were "[t]he two employees currently assigned to the Albany District Office," they were both provided with a copy of the executed agreement. (A73, 749.) The MOU was executed on behalf of the DOL by five DOL directors and officers including Michelle Ouellet, the national Director, Division of Management and Administrative Programs and James R. Turner, Jr., the Northeast Region Director. (Id.) Signers for the union included both national and regional union officers and members. (Id.)

In April 2001, a memorandum was issued to all DOL agency heads by Acting Assistant Secretary for Administration and Management of DOL Edward C. Hugler. (A230-31.) The memo stated, among other things, that, "in light of [President Bush's] intention to reduce management layers within the Federal government and to redistribute resources from higher-level managerial positions to service delivery positions, you should consider ways and opportunities to flatten your organizations." (A230.) Although the memo was silent as to whether the attrition-only policy would remain in effect, Regional Director Turner testified that he interpreted the memo to mean that OFCCP could discontinue the attrition-only policy and move forward with closing the Albany office. (A1795.) After consulting with Harold Bush, Acting Deputy Director of OFCCP, Turner told Michelle Oulett that "we were prepared to move forward" with the 1994 streamlining plan which included closing the Albany office (A1795-96.)

On October 3, 2001, eight months after the effective date of the MOU, petitioners received a call from Turner informing them that the Albany Field Station was slated to close on November 1, 2001. (A1956-59.) Almost two weeks later, the Union again met with OFCCP management to negotiate the impact of the announced closure. (A1804.) Those negotiations resulted in a second memorandum of understanding which provided that the Albany office would be closed on December 31, 2001 and that petitioners would be directed to report to the Hartford office. (A34-35.) That second agreement, however, never became effective because it was not ratified by either the DOL or the Union at the national level as required by both its own terms and the terms of the underlying collective bargaining agreement between the DOL and the union.[2] (A34-35, 1741-43, 1830-31, 1904-07, 2060-61.) Although the record is not clear as to why the second agreement was not ratified by the DOL, regional Union representative Frederick DeWald testified that he contacted the Union's president and told him he had reservations about the agreement and that he should review it before ratifying it. (A2061.)

On November 1, 2001, Turner sent memoranda to both petitioners stating that beginning December 23, 2001, they would be reassigned to the Hartford District Office, that they would be entitled to "Permanent Change of Station relocation expenses" and that they could request reassignment to any vacant Equal Opportunity Specialist positions within OFCCP. (A39-40, 1365-66.) The memoranda purported to list the available vacancies in an attached list, but failed to list 11 vacant positions that were in the OFCCP's northeast region. (Id.) Aside from the Hartford office, only positions in the

---

[2] Article IV of the second agreement provided "In accordance with Article 53, Section 4 of the DOL/NCFLL agreement, all regional agreements are subject to ratification by the NCFLL and approval by the Department of Labor." (A35.) Respondent concedes that the second agreement "lacked the requisite final signatures." (Respondent's Memo at 13.)

southeast, pacific and midwest regions were listed in the attachments to the memoranda. (A. 41.) The memoranda further stated that petitioners had 30 days to accept reassignment to Hartford or to "one of the alternative duty stations." (Id.) Reply forms were included with the memoranda and petitioners were instructed to indicate their choice of one of the following three alternatives: "I accept the reassignment to the Hartford District Office; I accept reassignment to _____ [*Enter name of alternative duty station from list*]; I decline the reassignment." (A37, 42, 208 (italics in original).) Both petitioners declined reassignment on November 29, 2001. (Id.)

On December 31, 2001, Northeast Region Deputy Director Diane Crothers proposed that petitioners be removed from service unless they accepted the reassignment. (A30-32, 201-03.) Petitioners did not respond to the OFCCP's proposal and, on January 28, 2002, Northeast Regional Director Turner issued a decision removing them from service effective February 8, 2002 for "failure to accept a directed reassignment and report to the Hartford District Office." (A26-28, 197-99.)

Petitioners appealed Turner's removal decision, asserting, inter alia, breach of the MOU. A hearing was held before an Administrative Judge ("AJ"), and on July 5, 2002, the AJ issued an initial decision concluding that petitioners' removal for failing to accept their directed transfers was proper. (A160-76.) The AJ held that the DOL had established a prima facie case that there were bona fide management reasons for the reassignments, that the DOL gave adequate notice of removal to petitioners and that petitioners failed to demonstrate that the reassignments "had no solid or substantial basis in personnel practice or principal." (A167.) The decision further noted that the removals were not unreasonable remedies for petitioners' failure to accept direct reassignment on

the grounds that "hardship, inconvenience, and subjective satisfaction are not, in themselves, sufficient reasons for refusing reassignment." (A172.) Petitioners' breach of contract claim was rejected by the AJ because "the MOU indicated that management was not waiving its rights under 5 U.S.C. § 7106." (A1290.)

Petitioners sought review of the AJ's initial decision by the MSPB, but the AJ's initial decision became final when the only two MSPB members could not agree upon the disposition of the case and thus could not issue a majority decision as required by law. See 5 C.F.R. § 1200.3(b) ("When due to a vacancy, recusal or other reasons, the Board members are unable to decide any case by majority vote, the decision, recommendation or order under review shall be deemed the final decision or order of the Board."). Neil A. McPhie, MSPB Board Acting Chairman, wrote separately to express his views that the AJ's initial decision should be "reversed as it concerns the [Petitioners'] claim of harmful procedural error, and that it should be affirmed as it concerns the [petitioners'] entitlement to relief." (A1509-18.) His opinion that harmful procedural error had occurred was based on his conclusion that involuntarily transferring petitioners was a violation of the MOU and therefore not legitimate. (A1511-16.) As to remedy, he concluded that petitioners could not be reinstated to their prior-held positions because the Albany office had already been closed for more than a year and that it would be "unduly burdensome" and "disruptive" to order the OFCCP to reopen that office. (A1517.) He further concluded that back pay was not recoverable because petitioners were not "ready, willing, and able to work" outside of Albany. (A1518.)

On September 1, 2004, petitioners filed a petition for review with the Federal Circuit. (A1459.) On October 13, 2004, the Federal Circuit issued an order

finding that the appeal of the MSPB's decision to the Federal Circuit was untimely because it was filed more than sixty days after the MSPB's decision. See Hamilton v. Dep't of Labor, No. 04 Civ. 9605, 2006 WL 760276, at *2 (S.D.N.Y. Mar. 22, 2006). The Federal Circuit considered dismissing the action for lack of jurisdiction, but instead chose to transfer the action to a district court, pursuant to 28 U.S.C. § 1631. Id. A condition of the transfer was that petitioners notify the Federal Circuit of the appropriate district court in which they could have filed the action. Id. Petitioners notified the Federal Circuit that they believed that the appropriate district court was the United States District Court for the Southern District of New York. Id. On November 23, 2004, the Federal Circuit issued an order, as a mandate, transferring the action to this Court. Id.

Respondent moved for dismissal of the action in this Court for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Fed. R. Civ. P. That motion was denied in the Court's March 22, 2006 Memorandum and Order. Id.

## II.
## Standard of Reivew

A final MSPB decision must be upheld unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6 (2001) ("The Federal Circuit's statutory review of the substance of Board decisions is limited to determining whether they are unsupported by substantial evidence or are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.") (internal quotation marks and citation omitted). Only one of the statutory grounds for review need be met to warrant granting a petition. Van Wersch v.

Dep't of Health and Human Srvcs., 197 F.3d 1144, 1148 (Fed. Cir. 1999).

When reviewing a final MSPB decision, a district court is bound by the same standard of review as the Federal Circuit. See Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).

Review of the MSPB's interpretation of agency regulations is de novo. Gose v. U.S. Postal Service, 451 F.3d 831, 836 (Fed. Cir. 2006) (noting questions of law are reviewed de novo and interpretation of a statute or regulation is a question of law); Kievenar v. Office of Personnel Management, 421 F.3d 1359, 1362 (Fed. Cir. 2005) ("Issues of statutory and regulatory construction are reviewed de novo."). Because "[t]he Board treats the provisions of a collective bargaining agreement to which the agency is a party in the same manner as it treats agency regulations, a reviewing court also reviews construction of a collective bargaining agreement de novo. Giesler v. Dep't of Transportation, 3 M.S.P.R 277, 280 (1980) ("the provisions of a collective bargaining agreement represent guiding principals and established non-discretionary policy under which [a federal agency] operates and which have the effect of regulatory requirements . . . ."), aff'd, 686 F.2d 844 (10th Cir. 1982).

Violations of collective bargaining agreements are reviewed for harmful procedural error. See Borden v. Dep't of Justice, 59 M.S.P.R. 353, 356 (1993) (violation of collective bargaining agreement may constitute harmful procedural error warranting reversal of the agency's action); Hall v. Dep't of Navy, 73 M.S.P.R. 251, 255 (1997). "Harmful error" is:

> Error by the agency in the application of its procedures which, in the absence or cure of the error, might have caused the agency to reach a conclusion different than the one reached. The burden is upon the

appellant to show that based upon the record as a whole the error was harmful, i.e., caused substantial harm or prejudice to his/her rights.

5 C.F.R. § 1201.56(c)(3). Thus, if an agency's violation of a provision of a collective bargaining agreement likely caused it to reach a conclusion different from the one it would have reached in absence of the error, harmful error has occurred. 5 C.F.R. § 1201.56(c)(3).

### III.
### Analysis

Subsection (a) of section 7106 recognizes that agency management has broad inherent authority. 5 U.S.C. § 7106(a). It makes plain that nothing in Chapter 71 of the Labor-Management Relations Act "affect[s]" the authority of the agency "to determine the . . .organization [and] number of employees . . ." or, in accordance with law, "to hire, assign, direct, layoff, and retain employees" and "to assign work. . . and to determine the personnel by which agency operations shall be conducted. . . ." Id. Section 7106(a) also makes it clear that the authority of management is "[s]ubject to subsection(b) . . . ." which allows the agency and any labor organization to negotiate "on the numbers, types, and grades of employees or positions assigned to any organizational subdivision" and "appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials." 5 U.S.C. 7106(b). Thus, the broad management authority may be limited in certain respects by the results of negotiation with a labor organization.

Here, Section III, paragraph F of the MOU provides as follows:

The Albany District Office will be redesignated as a Hartford District Office Field Station located in Albany. The two employees currently assigned to the Albany District Office will be assigned to the Field Station. The two employees will not

>involuntarily lose pay or grade or be transferred as a result of this merger action.

(A72.) Insofar as it relates to the two petitioners, the language of the last sentence of paragraph F is comfortably within section 7601(b)(3) as "appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials." 5 U.S.C. § 7601(b)(3).

It is the meaning of Section IV, paragraph C of the MOU which lies at the crux of the present controversy. It provides that "It is understood that nothing in this MOU implies a waiver by Management of its rights." (A73.) Giving the words of paragraph C their plain meaning, the word "implies" neither adds nor detracts from the meaning of the sentence. In this context "implies a waiver" has no meaning different from "is a waiver."

Unstated in the phrase is whether the non-waiver applies to matters encompassed within the MOU or matters not covered by the MOU. If paragraph C were to be interpreted to mean that nothing in the agreement is a waiver of any right of management, even with respect to that which is expressly addressed in the agreement, it would nullify the meaning of most terms of the elaborately negotiated MOU. But for the MOU, the agency would have had broad management rights with regard to the merger and organization of its regional operations. The premise of the MOU is that management is bargaining away certain of those rights with the union, as it is empowered to do.

A far more reasonable interpretation of the language of Section IV, paragraph C, is that the terms of the MOU do not amount to "a waiver by Management of its rights" on any subject not addressed in the agreement. See UAW v. Yard-Man, Inc.,

716 F.2d 1476, 1479-80 (6th Cir. 1983) (collective bargaining agreements must be read in context of the entire agreement "and must be construed so as to render [no term] nugatory and [to] avoid illusory promises"); Muniz v. Newman, 972 F.2d 1304, 1320 (Fed. Cir. 1992) ("a cardinal rule of contract interpretation requires that an interpretation which gives meaning to all parts of a contract will be preferred to one which leaves a portion of it useless, inoperative, meaningless or superfluous."). This interpretation gives meaning to both paragraph C and preserves the meaning of the other provisions of the agreement. It most closely follows the intention of the parties as discerned from a review of the agreement as a whole. See Alvin, Ltd. v. U.s. Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) (terms of a contract are to be applied in a logical manner consistent with the language itself, the intent of the parties, and the agreement as a whole.).

### Conclusion

This Court concludes that the AJ's erroneous interpretation of the MOU constituted harmful procedural error. See Roseman v. Dep't of the Treasury, 76 M.S.P.R. 334, 1997 MSPB LEXIS 1007 (1997) ("we find that the administrative judge's failure to analyze [disability issue] constitutes error."); Bonner v. MSPB, 781 F.2d 202, 206 (Fed. Cir. 1986) ("bare conclusion devoid of analysis is inimical to a rational system of administrative determination and ultimately inadequate"); Gose, 451 F.3d at 840 (decision of Board reversed and remanded where administrative judge and board "erroneously deferred to the agency's unreasonable interpretation of its regulation."). As such the petition for review is granted. The matter is remanded to the Board address the appropriate remedy.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       July 1, 2008